UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

INFINITEX SOLUTIONS LLC,

Case No. _____

                          Petitioner,

          - against -

ML HEALTHCARE PARTNERS GMBH and
SUHAIL AL ANSARI,

                          Respondents.

**PETITION FOR ATTACHMENT AND TEMPORARY RESTRAINING ORDER
IN AID OF ARBITRATION**

Petitioner Infinitex Solutions LLC ("**Infinitex**" or "**Petitioner**"), by and through its attorneys, Holland & Knight LLP, as and for its Petition against Respondents ML Healthcare Partners GmbH ("**ML Healthcare**") and   Suhail al Ansari ("**Suhail**") (collectively "**Respondents**"), respectfully alleges as follows:

## INTRODUCTION

1.      Infinitex respectfully submits this Petition under Sections 7502(c), 6210, and 6212 of the New York Civil Practice Law and Rules, as applicable pursuant to Rule 64 of the Federal Rules of Civil Procedure, for an order of attachment and temporary restraining order, together with expedited asset discovery, in aid of arbitration against Respondents that Infinitex is in the process of commencing before the American Arbitration Association in New York City.

2.      The parties' business relationship is governed by a certain Profit-Sharing Loan Agreement, dated as of October 4, 2021 (the "**Profit-Sharing Loan Agreement**"), whereby Infinitex agreed to loan $2,840,000.00 to fund ML Healthcare's purchase, import, and resale of

personal protective equipment ("**PPE**") in exchange for repayment of the loan, plus 30% of profits from the resale of PPE, on or before December 5, 2021 (the "**Maturity Date**").  The Profit-Sharing Loan Agreement was executed by ML Healthcare and was guaranteed and assumed by Suhail.

3.      This dispute arises from Respondent's failure to pay all amounts due and owing on the Maturity Date of the Profit-Sharing Loan Agreement.

4.      Although Respondents have reaped the benefits of receiving the $2,840,000.00 loan from Infinitex, Respondents have refused to hold up their end of the bargain, stringing Infinitex along for approximately nine months with repeated false promises of repayment.

5.      On numerous occasions, Respondents have represented that the loan was used to obtain overseas products, including masks and PCR test kits, that ML Healthcare has reached resale agreements with numerous parties, such as governmental authorities in Australia, that liquidity to ML Healthcare was forthcoming, and that any liquidity would be used to repay Infinitex.  Yet, Respondents have failed to remit payment of a single penny towards the amount due and owing under the Profit-Sharing Loan Agreement.

6.      The Profit-Sharing Loan Agreement calls for any disputes to be resolved by arbitration to be commenced under the American Arbitration Rules in a forum chosen by Infinitex. Given Respondents' conduct, Infinitex intends to commence an arbitration before the American Arbitration Association in New York City.

7.      Without the attachment and temporary restraining order, any award of judgment in the arbitration proceeding, to which Infinitex is entitled, may be rendered ineffectual.

8.      The Petition seeks an Order of this Court: (i) attaching any assets, accounts, or other property owned by Respondents or their affiliates, or in which they have an interest, in the amount of approximately $4,595,600.00, representing funds wrongfully withheld from Petitioner to date

together with pre-judgment interest, reasonable attorneys' fees, and arbitral/mediation fees and costs; (ii) issuing a temporary restraining order forbidding the transfer or removal of any assets, accounts, or other property that may be subject to the attachment; (iii) granting expedited discovery to identify additional assets that can act as security; and (iv) directing Respondents that any future proceeds or profits made by ML Healthcare must be deposited and held in the Account (as defined below).

9.      The arbitration proceeding will be commenced within 30 days of the granting of the temporary restraining order and issuance of the order of attachment.

10.     There has been no prior application for this relief in this case.

## THE PARTIES

11.      Infinitex is a limited liability company formed and operating under the laws of Puerto Rico and maintains its principal place of business at 105 Avenida Jose De Diego Gallery Plaza, South Tower, Unit 803, San Juan, Puerto Rico 00911.  Khalid Raoof ("**Raoof**") and Nabeel Qadri ("**Nabeel**") are the co-founders and managing members of Infinitex.  Infinitex is a trade financing, international distribution, and supply chain consulting entity.

12.     On information and belief, Respondent ML Healthcare is a company formed and operating under the laws of Switzerland and maintains its principal place of business at Waldhof 2, CH-6300 Zug, Switzerland.  The Chief Executive Officer of ML Healthcare is Lars Sonck ("**Lars**").  Based on the company's website, ML Healthcare actively operates in the healthcare and medical supplies sectors, with a focus on strengthening supply chains and procurement capabilities. ML Healthcare touts itself as having a significant reach with manufacturers and validated production facilities around the world to provide quality products and services for medical supplies.

13.     On information and belief, Respondent Suhail is an individual residing in the United Kingdom ("**UK**") and an owner of Gawah Holdings Inc. ("**Gawah**"), a company based in the United Arab Emirates ("**UAE**").  The ML Healthcare website states that "ML Healthcare Partners has welcomed Gawah Holdings Inc. as a significant and strategic equity shareholder." Similarly, a press release, dated March 23, 2021, states that Gawah is an "equity investor with a significant stake" in ML Healthcare.

14.     Suhail is the <u>only</u> other individual, besides Lars, featured on ML Healthcare's website.  The ML Healthcare website describes Suhail as the "co-founder and Deputy Vice Chairman" of Gawah, having "formerly led a large healthcare business in one of the largest sovereign investment companies in the world" with "vast experience in the healthcare industry . . . [that] provides leadership to ML Healthcare Partners and oversight from a shareholder level."

15.     On information and belief, Suhail is the Ultimate Beneficial Owner ("**UBO**") of Gawah, and Gawah has at least a 40% ownership interest in ML Healthcare.  On information and belief, Suhail, through Gawah, has a direct ownership interest in ML Healthcare.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between Petitioner and Respondents, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

17.     Pursuant to Section 8 of the Profit-Sharing Loan Agreement, ML Healthcare agreed to submit to the jurisdiction of New York:

> This Agreement shall be governed by, construed and enforced in accordance with the laws of the State of New York, United States of America to the jurisdiction of which the Parties hereto submit without reference to choice of law rules.

18.     Based on the foregoing clause, venue is proper under 28 U.S.C. § 1391(b)(3).

## FACTUAL BACKGROUND

19.     In the midst of the COVID-19 pandemic, and with a background of over ten years in international healthcare distribution, Raoof and Nabeel were uniquely positioned to assist in addressing the global shortage of PPE.

20.     To that end, in early 2021, Raoof and Nabeel began a working relationship with Suhail, who was an individual with well-established global healthcare supply chain connections, including in Malaysia and China.

21.     For more than three months, Suhail, Nabeel, and Raoof negotiated the terms of an agreement for procuring medical gloves from Malaysia intended for healthcare facilities, including the brand, the minimum order quantity, and the price point.

22.     On July 28, 2021, when the negotiations were nearly finalized, Suhail stated that he would "loop in" Lars, whom he referred to as his "med supplies CEO."  Suhail indicated that any business with him must be done through ML Healthcare and Lars.

23.     However, Suhail made clear through WhatsApp messenger that he is in control of ML Healthcare and Lars:

> "In the meantime, feel free to openly speak with Lars, he's solid and I trust him and *he doesn't do anything without consulting with me generally (although technically he owns majority of ML Healthcare) and being aligned.*" (Emphasis added).

24.     Nabeel and Raoof continued negotiations with Lars but never stopped communicating with Suhail.

25.     Ultimately, the deal to procure medical gloves was not successful because, according to Suhail and Lars, the production of medical gloves in Malaysia was significantly delayed, inspections were strict, and shipping was also delayed.

26.     On August 5, 2021, Lars, by an e-mail to Nabeel and Raoof, with a cc to Suhail, transmitted a "full product list" that ML Healthcare could help procure.  Lars asked Nabeel and Raoof to consider if any other type of medical supply could address current healthcare facility needs.

27.     On August 17, 2021, Lars suggested that Infinitex should consider procuring masks instead of gloves because "the product is ready to go."  The e-mail stated:

> "There is a good opportunity with straight forward [*sic*] transactions for 3ply masks that I think we should look at together.  The instant demand is high and we have the product ready to go."

28.     Lars understood at this time that Nabeel and Raoof were wary of expending efforts to procure any medical supplies that could be caught up in delays with production, inspection, or shipping due to the failed efforts to procure medical gloves.

29.     Suhail agreed with Lars that the procurement of masks would not be faced with the same issues as the procurement of gloves.  Suhail's e-mail to Nabeel and Raoof stated:

> "I have briefed Lars and he will be in touch to have a discussion with you to work out details and how this could potentially look. Let's explore and decide either way quickly.  We will de-risk and have buyers lined up with us, product ready and simply replace our current financing mechanism with you on this."

30.     Suhail proposed a business arrangement in which Nabeel and Raoof, through Infinitex, would fund ML Healthcare to purchase, import, and distribute the masks.

31.     Lars indicated that Sinopharm ("**Sino**"), ML Healthcare's manufacturer of the masks, would not face any China to US shipping or inspection logistical issues because "[t]hey have been selling to a military affiliated body ongoing."

32.     Lars even represented on multiple occasions that he would be able to distribute masks quickly, stating:

- "[T]here are numerous buyers and we can transact direct."
- "Looks like another buyer will commit to an LC for 3-Ply masks, longer ongoing deal, sales side looking good."

33.     During these discussions, Nabeel and  Raoof expressed concerns to Suhail about a new transaction with ML Healthcare due to ML Healthcare's failure to deliver the gloves in the prior deal.

34.     As reassurance and to induce Infinitex into entering into a new deal with ML Healthcare, Suhail stated on several occasions that he would "backstop" any transaction with ML Healthcare and that he would "stand behind" and personally be responsible for ML Healthcare's obligations should ML Healthcare default in its repayment of the amounts due and owing to Infinitex.

35.     Based on the representations made by Lars and Suhail, Infinitex agreed to enter into a short-term loan agreement to fund the purchase of masks from manufacturers and distributing them globally, believing that the masks were ready to be bought and would be immediately shipped and sold to customers with a distribution and logistics management margin that would be shared between ML Healthcare and Infinitex.

**A.     <u>The Profit-Sharing Loan Agreement</u>**

36.     Lars, on behalf of ML Healthcare, and Nabeel and Raoof, on behalf of Infinitex, negotiated the terms of the agreement between Infinitex and ML Healthcare. Suhail also was involved in the negotiations of the agreement.

37.     Despite primary negotiations occurring between Lars, Nabeel, and Raoof, the understanding was that Suhail would have the ultimate say regarding the terms and conditions of any agreement entered into by ML Healthcare.

38.     Throughout the negotiation process, Suhail was copied on all communications between Lars, Nabeel, and Raoof.

39.     On September 21, 2021, Suhail pushed for the agreement to be finalized quickly, stating:

> "Let's get this done, guys, the opportunity is not going to be around if we let it linger. China is done with holidays today, so perfect timing to close it up, transact and make some success together!"

40.     On or about September 28, 2021, ML Healthcare, as borrower, and Infinitex, as lender, entered into an agreement made as of September 28, 2021.

41.     On or about October 4, 2021, ML Healthcare, as Borrower, and Infinitex, as Lender, entered into the Profit-Sharing Loan Agreement.[1]

42.     Based on Infinitex's representations that the masks were "ready" and that the buyers were lined up to purchase the masks, Infinitex entered into the Profit-Sharing Loan Agreement with ML Healthcare.  Infinitex would not have entered into the Profit-Sharing Loan Agreement with ML Healthcare if not for assurances regarding availability of the masks and the buyers.

43.     Moreover, Suhail's assurances and commitment to "backstop" ML Healthcare's obligations induced Infinitex to go forward with and enter into the Profit-Sharing Loan Agreement with ML Healthcare.  Infinitex would not have entered into the Profit-Sharing Loan Agreement with ML Heathcare if not for Suhail's assurances and "backstop" commitment.

44.     Suhail was copied on the e-mails containing drafts of the Profit-Sharing Loan Agreement to ML Healthcare as well as the execution copy of the Profit-Sharing Loan Agreement.

---

[1] The Profit-Sharing Loan Agreement is substantially similar to the agreement made as of September 28, 2021.

45.     Lars, as CEO, signed the Profit-Sharing Loan Agreement on behalf of ML Heathcare.  Nabeel and Raoof, as Managing Directors, signed the Profit-Sharing Loan Agreement on behalf of Infinitex.

46.     Pursuant to the Profit-Sharing Loan Agreement, Infinitex agreed to lend ML Healthcare the principal amount of $2,840,000.00 (the "**Loan**").

47.     ML Healthcare agreed to use the Loan "for its business operations, including overseas purchase, importation to United States and resale of personal protective equipment including respirator masks and related items (collectively 'PPE')."

48.     Section 1 of the Profit-Sharing Loan Agreement provides that "the entire outstanding principal and any PPE Profits (defined herein) on the Loan shall be due and payable on December 5th 2021 (the 'Maturity Date')."  Section 1 also provides:

> If any payment obligation under this Note is not paid by the Maturity Date, the remaining unpaid principal balance and any PPE profits shall become immediately due and payable.

> On the date on which all amounts of principal and PPE Profits on the Loan are paid in full and the Parties hereto agree to terminate this Agreement.

49.     Pursuant to Section 3 of the Profit-Sharing Loan Agreement, ML Healthcare agreed to pay "Additional Compensation" to Infinitex defined as "thirty percent (30%) of the profit from the resale of PPE purchased with Loan proceeds ('PPE Profits')."  "PPE Profits" was further defined as follows:

> "PPE Profits shall be the revenue from the resale of PPE purchased with Loan proceeds ('PPE Revenues') less: all direct and applicable direct and indirect costs of the products, including cost of the Products, handling, packaging, transportation and forwarding costs, duty, tax, storage, insurance, marketing and other costs of purchase and resale which will be fully documented (collectively the 'Costs and Expenses')"

50.     Section 4 of the Profit-Sharing Loan Agreement provides that "Failure of Borrower to pay the principal amount [and] any PPE Profit by the Maturity Date" constitutes an "Event of Default" and that "if an Event of Default occurs and is not expressly waived by Lender, then the outstanding principal and all accrued PPE Profit portion on this Loan shall automatically and without any action on the part of Lender becomes immediately due."

51.     Section 5 of the Profit-Sharing Loan Agreement provides that "all notices, consents, approvals and requests required or permitted under this Agreement shall be given in writing and shall be effective," among other things, if delivered "by a nationally recognized overnight delivery service (such as Federal Express)." Notice to ML Healthcare must be made to "Waldhof 2, CH-6300 Zug, Switzerland."  "Routine or administrative notices" can be made by "electronic mail" to "ls@mlhealthcarepartners.ch."

52.     ML Healthcare agreed in Section 8 of the Profit-Sharing Loan Agreement that New York law would govern the terms of the Profit-Sharing Loan Agreement and that ML Healthcare would submit to the jurisdiction of the New York courts:

> This Agreement shall be governed by, construed and enforced in accordance with the laws of the State of New York, United States of America to the jurisdiction of which the Parties hereto submit without reference to choice of law rules.

53.     Section 11 of the Profit-Sharing Loan Agreement provides that any "Disputes" would be resolved through a "non-binding mediation" and, if unsuccessful, through an arbitration before a single arbitrator of the American Arbitration Association ("**AAA**") at a location chosen by Infinitex:

> [H]owever, in the event that the Parties are unable to resolve any Dispute, such Parties shall first attempt to settle such Dispute through a non-binding mediation proceeding. In the event any Party to such mediation proceeding is not satisfied with the results thereof, then any unresolved Dispute shall be finally settled in accordance

> with an arbitration proceeding before a single arbitrator appointed in accordance with the rules of the American Arbitration Association, in a proceeding pursuant to such rules to be held in a location chosen by the Lender. The arbitrator shall award costs and expenses including reasonable lawyer's fees, to the prevailing party. In no event shall the results of any mediation proceeding be admissible in any arbitration or judicial proceeding.

54.     Infinitex and ML Healthcare understood that any potential arbitration would be held in New York City.  The arbitration that Infinitex will commence against ML Healthcare and Suhail will be held at the AAA's offices in New York City.

55.     Having been involved in the negotiations of the Profit-Sharing Loan Agreement and having been e-mailed a copy of the executed Profit-Sharing Loan Agreement, Suhail was fully aware of the arbitration provision contained therein.

56.     On October 5, 2021, Infinitex performed its obligations under the Profit-Sharing Loan Agreement by disbursing $2,840,000.00 to ML Healthcare's account at the bank of Credit Suisse (Schweiz) AG, ZUG, located at Bahnhofstrasse 17, CH-6301, Zug, Schweiz, bearing USD account number xxxxx72-72 and IBAN account number CH85 0483 xxxx xxxx 7200 1 (the "**Account**").

**B.     ML Healthcare's Representation Regarding the Procurement of Masks**

57.     After entering into the Profit-Sharing Loan Agreement, ML Healthcare continued to represent that the masks were bought, ready to be shipped, and ready to be sold to willing buyers.

58.     On October 31, 2021, Lars sent to Raoof, via WhatsApp messenger, 13 videos taken at the factory showing that the masks were produced, packaged, and ready to be shipped.

59.     To that end, Lars stated: "Everything is in order, and first batch product is 120% ready[.]"

60.     On December 1, 2021, in response to a request for status update on the masks,  Lars stated:

> Its [*sic*] in the works, products bought, and sale is ongoing. Suhail wants to discuss further on the deal plus more opportunities on the antigens together as there is more opportunity to do more together, including but also beyond masks. He has been a bit questioning on the nature of the agreement with time and approach, but better he takes it direct with Nabeel and [Raoof.]

61.     To this day, it is unclear whether: ML Healthcare actually purchased the masks; the masks were delivered to the United States; the masks were sold to any buyers; and whether ML Healthcare made any profits from the sale of such masks as contemplated in the Profit-Sharing Loan Agreement.

62.     ML Healthcare knowingly made material misrepresentations on which Infinitex relied and Infinitex would not have entered into the Profit-Sharing Loan Agreement with ML Healthcare had it not been for these misrepresentations.

## C.     ML Healthcare's Default Under The Profit-Sharing Loan Agreement

63.     As noted, Section 4 of the Profit-Sharing Loan Agreement provides that an "Event of Default" shall occur upon ML Healthcare's failure to pay the Loan and the PPE Profits by the Maturity Date and that the Loan and the PPE Profits (the "**Debt**") shall automatically, and without any action by Infinitex, become immediately due.

64.     ML Healthcare failed to pay any portion of the Debt on or before December 5, 2021, the Maturity Date.

65.     Accordingly, an Event of Default occurred under Section 4 of the Profit-Sharing Loan Agreement and the Debt became due and owing.

66.     To date, ML Healthcare has failed to pay any part of the $2,840,000.00 or the PPE Profits due to Infinitex under the Profit-Sharing Loan Agreement.

67.     In short, as a result of ML Healthcare's failure to repay the Debt due and owing under the Profit-Sharing Loan Agreement, Infinitex has no choice but to commence an arbitration to recover the monies due from ML Healthcare.

**D.     Suhail's Assumption of ML Healthcare's Obligations Under the Profit-Sharing Loan Agreement and Agreement to Pay the Monies Due Infinitex Under the Profit-Sharing Loan Agreement**

68.     As noted above, Infinitex would not have entered into the Profit-Sharing Loan Agreement with ML Healthcare if not for Suhail's assurances that he would "backstop" any transaction with ML Healthcare and that he would be personally responsible for ML Healthcare's obligations if ML Healthcare defaulted or was unable to pay the monies due Infinitex.

69.     In response to multiple phone calls, text messages, and WhatsApp messages, Suhail indicated in early December 2021 that ML Healthcare would not pay the Loan on the Maturity Date and that ML Healthcare would need a few weeks to get product delivered to pay the Loan.

70.     By phone call, text message, and WhatsApp messenger, Suhail and ML Healthcare were notified that ML Healthcare had breached, and was in default of, its obligation to pay the Debt due and owing under the Profit-Sharing Loan Agreement.

71.     Significantly, in December 2021, Suhail "instructed" Infinitex not to communicate with Lars because he dropped the ball on being CEO of ML Healthcare and managing the Loan investment into distribution deals.  Consistent with his prior assurances, Suhail reiterated that Infinitex would be paid on the Profit-Sharing Loan Agreement.

72.     Commencing in December 2021 and continuing through the present, Suhail has repeatedly stated that he would be personally responsible for the repayment of the Debt in exchange for Infinitex agreeing to forbear from exercising its rights and remedies against ML

Healthcare, including, but not limited to, the commencement of an arbitration to recover the monies due.

73.     Suhail promised that he would pay the Debt, including $2,840,000.00, owed by ML Healthcare to Infinitex.

74.     As a result of Suhail's promise, Infinitex agreed to and did forbear and refrain from exercising its legal remedies against ML Healthcare and did not commence an arbitration against ML Healthcare.

75.     Infinitex reasonably relied on Suhail's promise and sustained injuries caused by such reliance.

76.     Had Infinitex immediately pursued its legal remedies against ML Healthcare, Infinitex might have been able to attach ML Healthcare's assets to satisfy a future arbitration award against ML Healthcare.

77.     From December 2021 through the present, Nabeel and Raoof have had substantial contact with Suhail regarding his agreement to personally pay the Debt due and owing from ML Healthcare.  These communications were made via FaceTime audio or Zoom calls, text messages and WhatsApp messenger.

78.     During these hundreds of communications, Suhail has repeated and confirmed his agreement to personally pay the monies owed by ML Healthcare to Infinitex under the Profit Sharing Loan Agreement.

79.     When the Debt could not be repaid by the Maturity Date, Suhail first requested an extension until January 3, 2022, for ML Healthcare to receive medical supplies, resell them, and pay off the Debt.  Suhail represented that the Debt could not be repaid because ML Healthcare was continuing to use the Loan as working capital.

80.     When the Debt was not paid by January 3, 2022, Suhail promised that the Debt would be repaid by February 4, 2022.

81.     On February 4, 2022, Suhail communicated that he was in the hospital with his wife and daughter, and that the Debt could not be repaid while he tended to his family.

82.     When Suhail was asked to provide another point person for communicating regarding the repayment of the Debt, Suhail unequivocally responded: "Contact on this matter is entirely me bro, no one else."  Suhail's response was consistent with an update he later provided that he "took away [the] authority and signatory right from [Lars] the day I decided to attend a vote of no confidence which I will, as a board member and chief executive[.]"

83.     On or about February 7, 2022, and on multiple occasions thereafter, Suhail promised again that he would be personally responsible for the repayment of the Debt in exchange for Infinitex agreeing to continue forbearing from exercising its rights and remedies against ML Healthcare.

84.     Over the course of approximately nine (9) months, Suhail purportedly made multiple extraordinary efforts in furtherance of his promise to repay ML Healthcare's Debt to Infinitex, including the following:

    a.  Collateralizing land in the UAE to get liquidity;

    b.  Expending $750,000.00 of personal funds and collateral to get a loan from a member of the royal family in the UAE in the amount of the Debt;

    c.  Selling land in the UAE to his cousins;

    d.  Liquidating a brokerage account into a Barclay's bank account in the UK; and

    e.  Asking his father to advance him $2,840,000.00 until Suhail gets paid back by ML Healthcare.

85.     Specifically, in an effort to repay the Debt with his personal funds, Suhail liquidated a brokerage account into a Barclays Bank PLC account to purportedly transfer the amount of £2,432,389.40 to Infinitex.  Infinitex has no particulars concerning this account other than that Suhail is a signatory on the account.  In any event, despite the request to close the account in April 2022, the funds in this account have not been transferred to Infinitex.

86.     Suhail has repeatedly stated that he will be getting liquidity "any day now" so that he could pay the $2,840,000.00 and that Infinitex will not need to pursue its remedies against ML Healthcare.

87.     As described by Suhail, he was doing anything and everything possible to put the Debt behind him because, as he admitted, "I need to deliver …. I am responsible."

88.     Suhail's foregoing actions are explainable only by his agreement to pay ML Healthcare's Debt to Infinitex.

89.     On July 25, 2022, Suhail reaffirmed that he is standing by his personal guarantee of the repayment of the Debt due from ML Healthcare to Infinitex.  During a telephone call between Suhail, Nabeel, and Raoof, Suhail expressed his appreciation for Infinitex's decision not to exercise its legal remedies and described his continuing efforts to satisfy his personal guarantee of the Debt.

90.     As recently as September 2, 2022, Suhail said that he would obtain a loan from a friend to pay at least $800,000.00 towards the Debt as a show of good faith.

91.     However, to date, Suhail has failed to pay any part of the Debt or the $2,840,000.00 owed to Infinitex.

92.    Similarly, Suhail, speaking on behalf of ML Healthcare, indicated on multiple occasions that ML Healthcare would be getting liquidity based on some "deal" happening so that it could pay the monies owed under the Profit-Sharing Loan Agreement.

93.    Notwithstanding these statements concerning payment from a "deal" about to close, ML Healthcare has not paid a penny of the $2,840,000.00 it owes to Infinitex.

94.    By letter dated September 5, 2022 ("**Demand Letter**"), Infinitex notified Suhail that ML Healthcare owes Infinitex at least $2,840,000.00 and demanded payment of $2,840,000.00 by September 8, 2022.

95.    Despite receipt of the Demand Letter, neither Suhail nor ML Healthcare has remitted payment to satisfy the Debt.

96.    In short, as a result of Suhail's failure to satisfy his agreement to personally pay the Debt that ML Healthcare owes Infinitex under the Profit-Sharing Loan Agreement, Infinitex has no choice but to commence an arbitration to recover the monies due from Suhail.

## RESPONDENTS ARE SUBJECT TO ARBITRATION

97.    Section 11 of the Profit-Sharing Loan Agreement contains an arbitration provision providing that "any unresolved Dispute shall be finally settled in accordance with an arbitration proceeding before a single arbitrator appointed in accordance with the rules of the American Arbitration Association, in a proceeding pursuant to such rules to be held in a location chosen by the Lender."

98.    ML Healthcare expressly consented to an arbitration at "a location chosen by" Infinitex.  Infinitex has chosen to commence an arbitration in New York City.

99.     Having guaranteed or otherwise assumed the obligations of ML Healthcare under the Profit-Sharing Agreement, Suhail is also bound to Section 11 of the Profit-Sharing Loan Agreement.

100.    In addition, Suhail is the UBO of Gawah, which, on information and belief, has at least a 40% ownership interest in ML Healthcare.  Thus, Suhail, through Gawah, has a direct ownership interest in ML Healthcare and directly benefited from the Profit-Sharing Loan Agreement.

101.    Suhail is also closely related to ML Healthcare.  Suhail is primarily responsible for the management of ML Healthcare and has had an active role in ML Healthcare.  Suhail was also actively involved in the negotiation and execution of the Profit-Sharing Loan Agreement.

102.    As a result of the foregoing, it was foreseeable to Suhail that he would be bound by the terms of the Profit-Sharing Loan Agreement, including Section 11.  Thus, it would be unjust (i) for Infinitex not to be able to reach Suhail as an essential player in this dispute and (ii) to allow Suhail to evade the arbitration provision in the Profit-Sharing Loan Agreement.

## ATTACHMENT IN AID OF ARBITRATION IS WARRANTED

103.    It is proper to order an attachment in aid of arbitration where a petitioner demonstrates that: (i) a cause of action exists; (ii) the petitioners likely will succeed on the merits of their claims; (iii) an arbitration award to which the petitioners may be entitled may be rendered ineffectual without such attachment; and (iv) the amount demanded by petitioners exceeds any counterclaims known to the petitioners.  *See* CPLR §§ 7502(c), 6212(a).

104.    New York courts may issue attachments in aid of arbitrations, even when the property is located outside of New York.  *See Mishcon de Reya N.Y. LLP v. Grail Semiconductor, Inc.*, No. 11 Civ. 4971 (RJH), 2011 WL 6957595, at *5-6 (S.D.N.Y. Dec. 28, 2011) (holding that

court is empowered to attach out-of-state property where court acquires personal jurisdiction over defendant) (citing *Hotel 71 Mezz Lender LLC v. Falor*, 14 N.Y.3d 303 (2010)).

105.     This Court has *in personam* jurisdiction over Respondents.   ML Healthcare explicitly agreed to New York's jurisdiction in the Profit-Sharing Loan Agreement.  Suhail, who assumed the Profit-Sharing Loan Agreement and remained closely-related to the transaction, has also agreed to New York's jurisdiction.

A.     **Infinitex's Claims Against Respondents Will Likely Succeed on the Merits**

106.     Infinitex's breach of contract claim against ML Healthcare will likely succeed on the merits.

107.     It is undisputed that ML Healthcare failed to perform its obligations under the clear and unambiguous terms of the Profit-Sharing Loan Agreement.  Indeed, ML Healthcare failed to pay $2,840,000.00 plus the PPE Profits on December 5, 2021 (the Maturity date) or any time thereafter to Infinitex.  Thus, ML Healthcare caused Infinitex to be damaged in the amount of at least $2,840.000.00.

108.     Infinitex is not aware of any meritorious defenses that ML Healthcare could assert against Infinitex's breach of contract claim.  Moreover, Infinitex is not aware of any counterclaims that ML Healthcare could assert against Infinitex.  Thus, the amount demanded by Infinitex exceeds any counterclaims known to Infinitex.

109.     Infinitex's claims for breach of contract and promissory estoppel against Suhail will also likely succeed on the merits.

110.     As set forth above, ML Healthcare breached the Profit-Sharing Loan Agreement and caused Petitioner to suffer damages in an amount exceeding $2,840,000.00.  Suhail is liable for ML Healthcare's breach of the Profit-Sharing Loan Agreement because: (i) he expressly

assumed ML Healthcare's obligations under the Profit-Sharing Loan Agreement; and (ii) he is closely related to ML Healthcare and the parties' business arrangement under the Profit-Sharing Loan Agreement.

111.    Suhail is also liable for the failure to perform under his guarantee of ML Healthcare's obligations.

112.    On multiple occasions, Suhail promised that he would be personally responsible for the repayment of the Debt and requested that Infinitex stop communications with Lars and ML Healthcare regarding repayment of the Debt.

113.    In exchange for and in reliance upon Suhail's promise, Infinitex agreed to and did forbear and refrain from exercising its legal remedies against ML Healthcare and did not commence an arbitration against ML Healthcare for approximately nine months.

114.    Infinitex's agreement to forbear from exercising its legal remedies was beneficial to Suhail, who was interested in preserving his reputation, as well as Gawah's reputation, in the healthcare industry.

115.    Despite Infinitex forbearing from exercising its legal remedies for approximately nine months, Suhail failed to uphold his promises.  To date, Suhail has not paid any portion of the $2,840,000.00 or the PPE Profits.

116.    As a result of its reasonable and detrimental reliance on Suhail's promise, Infinitex was unconscionably injured.  Delayed enforcement of the Profit-Sharing Loan Agreement allowed ML Healthcare to further dissipate its assets, rendering any future arbitration award to be essentially ineffectual against ML Healthcare.

117.    Infinitex is not aware of any meritorious defenses that Suhail could assert against Infinitex's claims.  Moreover, Infinitex is not aware of any counterclaims that Suhail could assert

against Infinitex.  Thus, the amount demanded by Infinitex exceeds any counterclaims known to Infinitex.

118.    Based upon the facts outlined in this Petition, Infinitex has further outlined in its memorandum of law, simultaneously filed herewith, additional claims against Respondents which will likely succeed on the merits.

**B.    Absent an Attachment of Respondents' Assets, an Arbitration Award Will Be Rendered Ineffectual**

119.    ML Healthcare is a foreign corporation not qualified to do business in New York that indisputably has breached the Profit-Sharing Loan Agreement.  Upon receiving $2,840,000.00 in October, ML Healthcare rapidly, and probably wastefully or fraudulently, spent $2,840,000.00 such that ML Healthcare was no longer in a position to repay even a portion of the Loan just a short two months later.  Despite numerous assurances about the "sale of product" and certain "deals" that should result in "liquidity" for ML Healthcare, not a single one of these "deals" resulted in payment of monies to Infinitex.  These misrepresentations and deceptive actions establish that ML Healthcare is either hiding its profits or is essentially insolvent and does not have the liquidity to satisfy the Debt to Infinitex.  Either way, there is a real and identifiable risk that ML Healthcare will not pay the future arbitration award.

120.    Infinitex is not aware of any ML Healthcare assets in New York or the United States.  The Account at Credit Suisse in Switzerland is ML Healthcare's last identified asset that could be used to satisfy an arbitration award against ML Healthcare.  It is unknown at this time whether ML Healthcare holds any funds in the Account.  ML Healthcare may have other assets in the form of corporate bank accounts, masks, PCR tests, or other PPE that was purchased using the Loan, but Infinitex has no specific knowledge of such assets.  If ML Healthcare's Account and

other assets are not immediately attached, there is a real risk that ML Healthcare will continue to conceal or dissipate its assets and not be able to satisfy a future arbitration award.

121.    Suhail is a nondomiciliary residing in the United Kingdom.  Despite having acknowledged his obligation to answer for ML Healthcare's Debt and despite having more than £2.4 million worth of funds in his Barclays account, Suhail has failed to pay any part of the $2,840,000.00.  Suhail has falsely assured Infinitex for the last nine months that he will repay ML Healthcare's Debt.  However, instead of making any payment to Infinitex, Suhail allegedly paid $750,000.00 in personal funds and collateral to another individual in an apparent attempt to render himself judgment proof.  Suhail has also attempted to sell his land in UAE and close out his Barclays account.  Although Suhail represented that such actions were taken in an attempt to pay off ML Healthcare's Debt, such actions – if accomplished – would make Suhail judgment proof.

122.    Infinitex is not aware of any assets Suhail has in New York or the United States. The Barclays account in London and land in UAE are Suhail's only identifiable assets that could be used to satisfy an arbitration award against Suhail.  If such assets are not attached, there is a real risk that Suhail will not be able to satisfy a future arbitration award.

**C.    Amount of the Attachment**

123.    Pursuant to the Profit-Sharing Loan Agreement and Suhail's promises, Infinitex is owed $2,840,000.00, plus any PPE Profits, attorneys' fees, and arbitral/mediation fees and costs. Infinitex respectfully submits that the amount of the attachment should be no less than $4,595,600.00, which consists of the $2,840,000.00 with one year of prejudgment interest ($255,600.00) at the rate of 9% per annum, plus $1,500,000.00 in reasonable fees and costs.

## EXPEDITED DISCOVERY IS WARRANTED

124.     "[T]he existence of a valid order of attachment is a mandate for a sheriff to levy upon assets of a party. So long as the order is outstanding and unsatisfied, a plaintiff is entitled to learn of assets to enable a sheriff to seize sufficient property to comply with the order." *Heller Fin., Inc. v. Wall St. Imports, Ltd.*, 140 Misc. 2d 205, 207 (Sup. Ct. N.Y. Cnty. 1988).

125.     Under CPLR § 6220, "at any time after the granting of an order of attachment . . . the court may order disclosure by any person of information regarding any property in which the defendant has an interest, or any debts owing to the defendant."

126.     Thus, Infinitex seeks expedited discovery into the scope and situs of Respondents' assets, accounts, or other property within the Court's jurisdiction, including identifying information for Suhail's account at Barclays and ML Healthcare's account at Credit Suisse, that could be used to satisfy an eventual arbitration award.

## A TEMPORARY RESTRAINING ORDER IS WARRANTED

127.     CPLR § 6210 expressly provides for a temporary restraining order preserving the status quo prior to an attachment hearing.

128.     As set forth above, there is a strong probability of success on the merits of Infinitex's claims against Respondents.

129.     Further, there is a serious risk of dissipation or secretion of property and assets by Respondents upon notice of this Petition.  Indeed, CPLR § 6210 itself acknowledges such risks associated with impending attachment orders and provides for pre-attachment temporary restraining orders in these circumstances.

130.   The equity tips in Infinitex's favor because it will suffer irreparable injury if Respondents were able to transfer, remove, sell, or conceal their assets – making themselves absolutely judgment proof – before Infinitex could even commence an arbitration proceeding.

131.   Infinitex does not seek the temporary restraining order without notice.  In light of the "Notice" provision of the Profit-Sharing Loan Agreement, Infinitex proposes to serve the Order to Show Cause by e-mail and by overnight delivery to the address set forth in the Profit-Sharing Loan Agreement.  Infinitex proposes to serve Suhail by e-mail and WhatsApp messenger at the address where Raoof and Nabeel have been communicating with Suhail.

WHEREFORE, Petitioner Infinitex Solutions LLC respectfully requests this Court issue an Order in aid of arbitration as follows:

(a) Granting a temporary restraining order prohibiting Respondents and their agents and affiliates from disposing of, processing, routing, facilitating, selling, transferring, encumbering, removing, conveying, paying over, or otherwise interfering with any property, debts, accounts, receivables, rights of payment, or tangible or intangible assets of any kind in which Respondents have an interest in the amount up to $4,595,600.00;

(b) Directing Credit Suisse (Schweiz) AG, ZUG to hold and retain within its control and prohibit anyone, including Respondents, their agents, or their affiliates, from withdrawing, removing, assigning, transferring, pledging, encumbering, disbursing, dissipating, converting, selling, gifting, or otherwise disposing of any accounts, documents, electronically stored information, assets, funds, or other property, relating to any account held in the name of ML Healthcare Partners GmbH or its aliases in the amount up to $4,595,600.00;

(c) Directing Barclays Bank PLC to hold and retain within its control and prohibit anyone, including Respondents, their agents, or their affiliates, from withdrawing, removing, assigning, transferring, pledging, encumbering, disbursing, dissipating, converting, selling, gifting, or otherwise disposing of any accounts, documents, electronically stored information, assets, funds, or other property, relating to any account held in the name of Suhail Al Ansari or his aliases in the amount up to $4,595,600.00;

(d) Directing Respondents to appear for a deposition, pursuant to Article 31 of the CPLR, at a time and place mutually convenient to the parties but not more than 45 days from the Order, and testify concerning any information relevant to any assets, accounts, or other property in which Respondents or their affiliates have an interest;

(e) Granting Infinitex the use of any disclosure methods provided for in Article 31 of the CPLR to discover any information relevant to any assets, accounts, or other property in which Respondents or their affiliates have an interest; and

(f) Granting such other and further relief as this Court deems just and proper.

Dated: New York, New York
       September 19, 2022

HOLLAND & KNIGHT LLP


By:      _/s/ Warren E. Gluck_____
         Warren E. Gluck
         Mitchell J. Geller

31 West 52nd Street
New York, NY 10019
T: (212) 513-3200
*Attorneys for Petitioner Infinitex Solutions LLC*

25